Filed 9/21/22  P. v. Reese CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br><br>DYLAN DAVID REESE,<br><br>        Defendant and Appellant. | A157480<br><br>(Contra Costa County<br>Super. Ct. No. 51713510) |

Defendant Dylan David Reese appeals a judgment entered upon a jury verdict finding him guilty of the second degree murder of Kimberly Hoglund. He contends the trial court improperly admitted evidence of prior acts of violence against two other women, that the prosecutor elicited inadmissible evidence, that the court erred in denying his request for a pinpoint instruction on the law of voluntary manslaughter, and that it improperly awarded victim restitution and imposed fines and fees without regard for his ability to pay.  We shall affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant does not dispute that he killed Hoglund.  His defense, rather, was that he killed her under the influence of passion and his crime was voluntary manslaughter.

1

## I. The Killing and Aftermath

### A. *Maureen's Testimony*

At the time of the killing, defendant had been in a relationship with another woman, Maureen K., for six years.[1]  On March 29, 2016, defendant and Maureen went to the home of co-defendant Andre Villedrouin, hoping to get heroin.  Hoglund was living in a studio apartment over a garage at Villedrouin's home, and both she and Villedrouin used heroin.

Villedrouin went somewhere else to get drugs, using defendant's car, a Mercedes Benz, and the others went to Hoglund's apartment.  While they were there, a knock on the door came, and two young men entered, asking for Villedrouin, saying something about a car, and appearing upset.  The two men went downstairs again, then returned.  The others who were in the apartment were smoking methamphetamine.

At some point in the evening or early nighttime hours, defendant went into the bathroom and retrieved heroin that was concealed in his anal cavity.  When he came out, the two young men attacked him, hitting him in the head and saying something about him robbing one of their friends or family members.  Defendant sat on the bed, and the two young men told him to give them his pants, his shoes, and whatever was in the pants.  One of them pointed a gun at defendant.  They left with defendant's pants and shoes in their hands, and Maureen heard a gun go off and a bullet hit the building.

Defendant borrowed clothes from Hoglund and left the apartment.  Before he left, Maureen traded him some Xanax for the heroin he had recovered.

---

[1] In the interest of privacy, we refer to some of the people involved in the events by their first names, intending no disrespect.

Maureen went to a friend's house and went to sleep. Defendant woke her at noon and told her that he had killed Hoglund's dog and they had to get the dog out of the house. They drove around for several hours, stopping at Villedrouin's house several times and leaving when he was not home. During the course of the day, defendant told Maureen that he had beaten Hoglund up because she had set him up to be robbed, and that he had killed her. As they were driving, defendant hit Maureen a couple of times on her head or shoulder. Eventually, they went into Villedrouin's house and found him at home.

When they entered, Maureen saw Hoglund's body lying face-up on the floor with a blanket covering all but her hands and hair. There was blood in various parts of the house. Hoglund was wearing only a T-shirt and underwear.

Maureen started cleaning blood from the house. While they were still in the house, defendant hit Maureen in her face and caused her nose to bleed, accusing her of cheating on him when he was in jail. He said he had brought her there to kill her after she finished cleaning. He told her to take the cover off Hoglund's face and to bend down and give her a kiss; Maureen thought he meant to emphasize that she would end up looking like Hoglund.

Defendant and Villedrouin carried Hoglund's body out of the house, through the back yard, and into the garage, then put the body into the trunk of defendant's car. With Maureen at the wheel, the three of them drove around looking for a place to dispose of the body. They eventually returned to Villedrouin's house and parked the car across the street, the body still in the trunk of the car.

Hoglund's body remained in the trunk for the next several days. During part of that time, defendant was in the hospital with a swollen hand.

3

Maureen stayed with her friend Jennifer W. while defendant was in the hospital. Defendant joined Maureen there after his release, and he told her that Jennifer had offered to let them use her yard to bury Hoglund's body. On April 7, the body was buried in Jennifer's yard.

A day or two later, defendant told Maureen they needed to go back to Jennifer's house to pick up the blankets Hoglund had been wrapped in and other items that had been taken from the trunk. When they got to the house, defendant grabbed a large black garbage bag, which smelled "really bad," and put the bag in a dumpster up the street.

### B. Jennifer's Testimony

Jennifer testified that when Maureen came to stay with her, she had marks on her face as if she had been in a fight. Defendant came to Jennifer's house a couple of days later. Jennifer knew something had happened to Hoglund, and she wanted to know if it had been an accident. Defendant told her it was not an accident and that he meant to beat Hoglund, but he said he did not expect her to die. Jennifer asked defendant why he had done it, and he answered, "fuck that bitch, she deserved it," and said that he thought Hoglund had set him up. Defendant told Jennifer that when he was killing Hoglund it was as if he had blacked out and no one could stop him. Regarding the people who were responsible for robbing him, defendant said he was going to get a shotgun and that he wanted to "fuck them up" or kill them.

After defendant got out of the hospital, he, Villedrouin, and Maureen went to Jennifer's house, and defendant asked Jennifer to allow him to back his car up and unload Hoglund's body in her back yard. She agreed to let him do so, then left the house. She returned two days later, and in the back yard she saw a black bag she had not seen before. At some point afterward,

4

defendant came to her house; when she opened the door, he grabbed her by the neck, then went around the house. After he left, Jennifer saw that the bag in the back yard was gone.

## II. The Investigation

Hoglund's body was found buried at Jennifer's house. She was clad only in underwear, a bra, and a T-shirt that was pulled up to her armpits.

An autopsy revealed Hoglund died of multiple blunt force injuries. Her injuries included external bruises on various parts of her body, including the legs, arm, hands, face, scalp, abdomen, flank, chest, and back; defensive hand wounds; seven fractured ribs; hemorrhaging in the intestine and supporting tissue, rib cage, and lung; bleeding in the kidney; and a tear in the liver. Some of the injuries could have been caused by punching but others, such as the injuries to the chest wall and ribs, were more consistent with kicking. Death would probably have taken place between minutes and an hour of the injuries.

A black plastic bag was later found in a dumpster. In it were pieces of trunk lining, two sheets, a bottle of bleach, a bed comforter, a car floor mat, and a shoe. Some of these items had blood on them that matched Hoglund's.

## III. Prior Violent Acts

Both Jennifer and Maureen testified about incidents in the past in which defendant had committed violent assaults.

*A. Assault on Michele M.*

Jennifer recounted an incident in May 2015 in which defendant assaulted another woman, Michele M. Jennifer was at her house with Michele and a few other people. Defendant arrived at the house. He was upset with Michele because she owed him money. When defendant came into the room, Michele hid in one the back rooms. Michele ran out of the room

5

while defendant was in the bathroom, and defendant ran after her, punched and kicked her, picked up a two-by-four board, and hit her with it twice. Jennifer told defendant she would call the police, and he came up to her with the two-by-four and struck it against the couch in a manner she saw as threatening, which frightened her.

Jennifer testified that she was afraid of defendant because of what she had seen him do, and she agreed to allow defendant to bury Hoglund's body on her property out of fear.

In count 2 of the information, defendant was charged with assault with a deadly weapon based on his attack on Michele. While the court was hearing in limine motions, defendant pled guilty to count 2 and admitted the associated great bodily injury enhancement, so the jury was not asked to decide these.

*B. Assaults on Maureen*

Maureen testified about two prior incidents when defendant assaulted her. In January 2014, Maureen was pregnant, and defendant thought another man was the father. He kicked her in the stomach and hit her in her ribs and her back. Michele was there at the time, and she told defendant to stop beating Maureen because he was going to kill her. During that incident, Maureen was afraid defendant would kill her.

The second incident took place in November 2015, when defendant beat Maureen because she had not written to him when he was in jail. On that occasion, he made her strip naked, beat her with his fists, and kicked her.

Maureen testified that she helped defendant clean up the house and dispose of Hoglund's body in part because she was afraid of what defendant would do to her if she refused.

6

## IV.  Defendant's Testimony

Defendant testified in his own defense.  At the time of the killing, he was using both methamphetamine and Xanax.  While he was at Hoglund's apartment that day, two men whom Hoglund referred to as her nephews showed up while Villedrouin was out in defendant's Mercedes Benz looking for drugs.  They referred to Hoglund as "Moms."  They told Hoglund they were there to "do some damage" to Villedrouin due to an altercation they had had with him over a different Mercedes Benz.  The two men left and returned three or four times over the next few hours.  At some point, Hoglund said the two men were not coming back, and defendant used the bathroom in an effort to retrieve a heroin-filled condom that he had swallowed.

While defendant was in the bathroom, he heard voices outside and he was told the nephews had returned.  When he left the restroom, one of the two men hit him on the left side of his head with a tool, then the other hit him with the butt of a gun and pointed the gun at his face.  The men forced defendant to the bed at gunpoint, told him to strip, and threatened to shoot him.  They pulled off his shoes and pants, leaving him in his underwear, terrified and humiliated.  In addition to defendant's pants, which contained his wallet, the men took his backpack and his coat.

The two men looked through Maureen's purse, but they did not take anything from Hoglund or from her purse.  One of them told defendant, "nothing better happen to Moms."  During the incident, Hoglund said nothing and seemed unconcerned.

The men left the apartment and went downstairs, and defendant heard a gunshot.  He searched for some clothes, and Maureen told him that while he was in the bathroom she saw Hoglund talking with her nephews on the front porch and that Hoglund wanted the heroin.  Defendant exchanged the

7

heroin he had retrieved with Xanax pills that Maureen was holding, and he left the apartment.

Defendant saw his Mercedes Benz in front of Villedrouin's house, running with its lights on, as well as a silver car. The two nephews were there, and one was in the Mercedes Benz, rooting through it. They left in the silver car. Defendant ran around the block, and when he got back, his car was gone.

Defendant knocked on Villedrouin's front door, and Villedrouin let him in. Hoglund came out of Villedrouin's room, defendant confronted her, and they argued and yelled at each other. He asked her why she had not stopped her nephews from beating, stripping, and robbing him, and she told him he "fucking deserved it." He "snapped," grabbed her by the shirt and hair, and threw her down. He was enraged, and he started kicking her. Villedrouin tried to stop him, but defendant threw him out of the way and continued to kick Hoglund. He described himself as "on autopilot," but he did not want to kill her.

When he stopped, Hoglund was crying, as defendant continued to say "awful things in the air," still "just so mad." He was looking out the window, and the next thing he knew, he woke up. Morning dawned, and Villedrouin told him Hoglund was dead. Defendant was miserable, and he could not believe what had happened. He testified he felt "[a]bsolutely terrible," awful, and ashamed, and that "[w]ords just can't explain how awful [he] felt."

Defendant admitted that he beat Maureen in January 2014 because he thought she was pregnant by another man and in November 2015 because she was not writing to him when he was in jail. He also admitted that he threw Michele to the floor, kicked her, and hit her with a two-by-four in May

8

2015, and testified he was charged with and pled guilty to a crime as a result of that incident.

## V. Verdict and Sentencing

The jury acquitted defendant of first degree murder, but found him guilty of second degree murder. The trial court sentenced him to an indeterminate term of 15 years to life for count 1, the second degree murder of Hoglund (Pen. Code, §§ 187, subd. (a), 190, subd. (a)), and a consecutive determinate term of six years for count 2, the assault with a deadly weapon on Michele, calculated as the middle term of three years, with an additional three years for the great bodily injury enhancement (Pen. Code, §§ 245, subd. (a)(1), 12022.7, subd. (a)). The court also imposed fines and fees.

## DISCUSSION

## I. Evidence of Prior Assaults

Defendant contends the testimony about his assaults on Maureen and Michele was inadmissible propensity evidence. As a general matter, evidence of a person's character is inadmissible to prove his or her conduct on a particular occasion. (Evid. Code, § 1101, subd. (a).)[2] However, this rule does not affect the admissibility of evidence of a prior crime or other act to prove a fact other than propensity to commit a particular act, such as motive, intent, preparation, plan, knowledge, or absence of mistake or accident. (§ 1101, subd. (b).)

*A. Background*

The trial court and counsel discussed the admissibility of defendant's earlier assaults on multiple occasions before the evidence was finally admitted.

_____

[2] All undesignated statutory references are to the Evidence Code.

Defendant made a motion in limine to exclude any evidence of alleged prior criminal acts. At a hearing on the motions in limine on October 25, 2018, the trial court indicated that the evidence of Jennifer's fear of defendant and the reason for it would be proper to explain why she would do something so shocking as allowing a body to be buried on her property, thus enhancing the credibility of the rest of her testimony in the minds of "somebody . . . who isn't used to burying people in their backyards." The court suggested it would be sufficient to introduce evidence that Jennifer saw defendant hit and injure someone with a two-by-four and that defendant was convicted of the offense. The court asked the parties to come up with a "script," in which Jennifer would be asked leading questions and her answers would be limited to the subject matter of those questions. The court cautioned, however, that this ruling was not final and might change depending on what evidence was admitted before Jennifer testified, and it emphasized, "I don't view any of my in limine rulings as permanent and unreviewable."

Turning to the attacks on Maureen, the court ruled that, "for the time being, based upon what I heard," anything that occurred during the killing or the events relating to burial of the body was relevant. It also ruled Maureen could testify that she had been beaten by defendant previously and received medical services as a result. The court asked the parties to agree to a script of leading questions to be asked on direct examination. Ultimately, the parties were unable to agree on such a script.

Defendant moved for reconsideration of the trial court's ruling on November 16, 2018. He contended evidence of his prior violent acts against Jennifer and Maureen was unnecessary to bolster their credibility because he did not intend to attack their testimony or credibility. At the hearing on the

10

motion, the prosecutor argued that without a "backstory," the jury might well doubt the credibility of someone who cleaned up a body and helped bury it.

In addition to the original ground for admitting limited evidence of defendant's prior assaults, the court articulated an additional reason the challenged evidence was admissible: in each of the prior instances, defendant deliberately used violence to retaliate against someone he thought had wronged him, which could suggest to the jury that he was acting in retaliation rather than heat of passion in this particular case. Citing *People v. Whisenhunt* (2008) 44 Cal.4th 174 (*Whisenhunt*), the trial court concluded the evidence was relevant to whether defendant acted with premeditation and deliberation.

The prosecutor presented a long list of prior violent acts defendant had allegedly committed against Maureen, including "countless" beatings, two that caused her to seek medical treatment and one in which she lost so much blood from her nose she almost passed out; rapes; sodomy; and forced prostitution. The court indicated that it would place "reasonable limits" on the testimony and that it would not allow "free-wheeling testimony" about dozens of incidents.

Ultimately, the trial court admitted evidence of the incidents in which defendant twice beat and kicked Maureen, because she had not written to him and because he thought she was pregnant with another man's child, and evidence of the attack on Michele. The court expressly stated that evidence that defendant forced his victims to strip was admissible to show his intent. It excluded evidence that during one of those attacks, defendant burned Maureen on her leg with a spoon, evidence of multiple other attacks on Maureen, evidence that defendant raped and sodomized her, evidence that he

11

put a gun in her mouth, and evidence that he forced her to work as a prostitute.

The jury was instructed it could consider evidence of the other offenses for two purposes: to decide whether defendant had the intent or mental state necessary to commit first degree murder, second degree murder, or manslaughter; and to evaluate Maureen and Jennifer's explanations for why they acted as they did.

*B. Analysis*

Defendant contends admission of the evidence of his attacks on Maureen and Michele was an abuse of the trial court's discretion and deprived him of a fair trial.

As we have explained, while evidence of prior conduct is generally inadmissible to prove propensity to commit a crime, it may be admissible to prove some other fact, including motive, intent, plan, identity, or absence of mistake or accident. (§ 1101, subds. (a), (b).) Because such evidence "may be highly inflammatory, its admissibility should be scrutinized with great care." (*People v. Medina* (1995) 11 Cal.4th 694, 748.) The trial court should admit the evidence only if it determines its probative value is not "substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Avila* (2006) 38 Cal.4th 491, 586–587; see § 352.) On appeal, we review a trial court's ruling under section 1101 for abuse of discretion. (*People v. Cage* (2015) 62 Cal.4th 256, 274 (*Cage*).)

Defendant argues the evidence of his prior bad acts served no proper purpose, but merely showed his propensity to commit such acts—that is, his penchant for violence—thus encouraging jurors to conclude he acted in conformity with his inclination for violence when he killed Hoglund.

12

We are unpersuaded.  Defendant did not dispute that he acted violently toward Hoglund and caused her death.  The only issue before the jury was whether his state of mind in so doing reduced his offense to manslaughter rather than murder—that is, whether he acted in the heat of passion due to provocation that would cause an ordinarily reasonable person to act rashly or without deliberation and reflection.  (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708; Pen. Code, § 192, subd. (a).)

The theory of the prosecution was that defendant beat and kicked Hoglund to take revenge on her for setting him up to be robbed.  That motive is significant, because the passion underlying manslaughter may *not* be " ' " 'the passion for revenge.' " ' " (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1551; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 (*Gutierrez*).)  Our high court has explained that no specific type of provocation is required, and that the passion aroused "need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citations] *other than revenge*."  (*People v. Breverman* (1998) 19 Cal.4th 142, 163, italics added; accord, *People v. Burnett* (1993) 12 Cal.App.4th 469, 478 ["Heat of passion may not be based upon revenge"].)

The Attorney General argues that evidence of defendant's prior attacks on Maureen and Michele was relevant to show that his motive in beating and kicking Hoglund was to take revenge on her.  Although motive is not an ultimate fact put at issue by a criminal charge, it is an intermediate fact that may reasonably prove a person's intent.  (*Cage, supra*, 62 Cal.4th at p. 274; *People v. Clark* (2021) 62 Cal.App.5th 939, 960.)  And "whether or not the defendant had the intent or mental state necessary to commit" murder was an issue the jury was told it could use this evidence to resolve.  Where evidence of another crime is admitted to show motive, the other crime "may

13

be dissimilar to the charged offenses provided there is a direct relationship or nexus between it and the current alleged crimes." (*Cage*, at p. 274.)

*Cage* is instructive. The defendant there was charged with murdering his wife's mother and brother. (*Cage, supra*, 62 Cal.4th at p. 263.) The defendant's wife had left him and taken the couple's two children to Puerto Rico. (*Id.* at p. 266.) The trial court admitted evidence that defendant had previously engaged in abusive and violent behavior toward his wife, one of their two children, and his wife's brother. (*Id.* at pp. 263–264, 272–273.) The defendant argued on appeal that the evidence was impermissibly used to show his propensity for violence. (*Id.* at p. 273.) Our high court upheld the trial court's ruling under section 1101, concluding the prior acts were important evidence of the defendant's motive, because they showed that the defendant reacted with anger, hostility, and punishment when his wife did not comply with his requests, and that he had for years sought to exert control over his wife, their child, and her brother by threatening and committing violent, demeaning, and abusive acts against them. (*Id.* at pp. 273–274.) These prior acts supported a logical inference that the defendant carried out his threats by committing the murders, "intending them as retribution for [his wife] leaving him and taking his son. A direct relationship or nexus, thus, existed between the prior incidents and the charged crimes." (*Ibid.*)

In reaching this conclusion, the court in *Cage* relied in part on *People v. Demetrulias* (2006) 39 Cal.4th 1 (*Demetrulias*) (see *Cage, supra*, 62 Cal.4th at p. 274.) The defendant in *Demetrulias* was charged with killing the victim, Robert Miller, while robbing him. (*Demetrulias*, at p. 5.) In Miller's home was found identification for one Clarence Wissel. Police went to Wissel's house and found it had been ransacked and Wissel had been stabbed and

bound with a cord. The defendant's identification was found at Wissel's home. (*Id*. at p. 7.) In the case on appeal, defendant was not charged with any offenses against Wissel, and he argued the evidence related to Wissel was inadmissible propensity evidence. (*Id*. at p. 13.) Our high court rejected this contention, concluding the Wissel assault and robbery tended to prove that the defendant had the intent to rob Miller when he attacked him and that he did not act in real or perceived self-defense. (*Id*. at p. 14.) That is, "evidence of defendant's motives for robbing and assaulting Wissel tended to show he had had the same motives earlier the same night when he stabbed Miller, and thus acted with the intent to rob, rather than in self-defense." (*Id*. at p. 15.)

Similar reasoning was used in *People v. Pertsoni* (1985) 172 Cal.App.3d 369 (*Pertsoni*), upon which our high court in *Demetrulias* relied. (*Demetrulias*, *supra*, 39 Cal.4th at p. 15.) The defendant in *Pertsoni* was charged with the shooting murder of a man he thought was an agent for the Yugoslav secret police, and he claimed he acted in self-defense. (*Pertsoni*, at pp. 371–372.) The trial court admitted evidence of an uncharged act in which the defendant shot at a man he believed was the Yugoslav ambassador and later expressed his hatred of the Yugoslav government and its representatives. (*Id*. at pp. 372–373.) The appellate court concluded the evidence was properly admitted under section 1101 because it tended logically to show the defendant's motive in committing the charged crime. Defendant argued the offenses were too dissimilar to permit an inference that he had the same motive in each case, but the appellate court explained that when "the mere *fact* of the prior offense gives rise to an inference of motive, similarity of the offenses is irrelevant." (*Id*. at p. 374.) And, the court concluded, evidence of the earlier incident was relevant "to show the lengths

15

to which appellant's passionate hatred of anyone connected with the Yugoslav government would take him," thus tending to show his motive in killing the victim "was to kill an agent of the detested government, rather than to protect himself against a perceived danger." (*Id*. at pp. 374–375.)

This rule was also applied in *People v. Spector* (2011) 194 Cal.App.4th 1335, 1381. There, the defendant was charged with murdering a woman he had brought to his home, and he claimed she had shot herself. (*Id*. at p. 1342.) The trial court admitted the testimony of five women who had been victims of armed assaults by the defendant in a home or hotel room after a sexual or romantic encounter. (*Id*. at pp. 1342–1343, 1354–1358.) This evidence, the appellate court concluded, was proper because it tended to show that the defendant acted with the same motive in the uncharged and charged offenses. (*Id*. at pp. 1381–1382, 1384–1385; accord, *People v. Walker* (2006) 139 Cal.App.4th 782, 803–807 [evidence of prior sexual assaults on prostitutes admissible under § 1101, subd. (b) to show defendant's motive of animus toward prostitutes and intent in charged murder of prostitute]; *Whisenhunt, supra*, 44 Cal.4th at pp. 203–205 [evidence of other prior child abuse probative of issues of intent and absence of accident in killing victim of charged crime].)

These authorities persuade us that the evidence of defendant's prior assaults on Maureen and Michele fell within the scope of section 1101, subdivision (b) because it tended to show that defendant was motivated by a desire for revenge when he beat and kicked Hoglund. In each prior incident, defendant assaulted a woman he thought had wronged him, Michele because he thought she was withholding money she owed him, and Maureen because he thought she was pregnant with another man's child and because she did not write to him while he was in jail. These earlier incidents do not show

16

merely that defendant had a tendency toward violence. (Cf. *People v. Williams* (2018) 23 Cal.App.5th 396, 421.) Rather, they reasonably tend to show he attacked Hoglund for the same purpose—to take revenge on her for wronging him—and that he acted intentionally in so doing, rather than acting while his reason was obscured by heat of passion. (See *People v. Beltran* (2013) 56 Cal.4th 935, 942.) ,

Nor are we persuaded the trial court abused its discretion by not excluding the evidence as more prejudicial than probative under section 352. Since evidence of other crimes is inherently prejudicial, it is admissible only if it has " '*substantial* probative value,' " measured by " ' "the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality), and the necessity of proving the issues by means of this particular piece of evidence (degree of necessity)." ' " (*Pertsoni*, *supra*, 172 Cal.App.3d at p. 375.) But, " '[b]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' " (*Ibid*.)

The trial court here weighed the evidence of prior attacks the prosecutor sought to introduce, which was extensive, and limited it to three incidents, expressly stating it had section 352 in mind while doing so. Each of the offenses was relevant to defendant's state of mind when he killed Hoglund, the primary disputed issue in the case. The attacks on Maureen and Michele may, as defendant points out, be characterized as horrific, but they showed the extremes he would go to when taking revenge on those he thought had wronged him, and they were no more horrific than the crime with which defendant was charged. (See *Pertsoni, supra*, 172 Cal.App.3d at

17

p. 375.)  The trial court did not abuse its discretion in admitting evidence of the three prior offenses.

Defendant argues the trial court misunderstood the law of manslaughter when it made its ruling.  He is correct that in the course of discussing the evidence with counsel, the court said, inaccurately, that voluntary manslaughter relies on malice aforethought, express or implied.  (See *People v. Rios* (2000) 23 Cal.4th 450, 463 ["Heat of passion . . . *precludes* a finding of malice *where malice is an element of the charge*"].)  But the court's ruling makes clear it understood the proper purpose for which the evidence was admissible, when it noted that to prove first degree murder the People had to show premeditation and deliberation.  And, the court explained, the prior incidents in which defendant deliberately used extreme violence against people he thought had wronged him suggested he acted in retaliation rather than heat of passion in the current case.

As to the assaults on Maureen, defendant argues the trial court admitted too wide a range of evidence because he had different intents in the two incidents.  (See *People v. Simon* (1986) 184 Cal.App.3d 125, 130–131 [earlier assault not relevant to prove defendant's state of mind in committing charged crime if motives were different].)  This contention is unpersuasive.  As to each assault, there is evidence he attacked Maureen in retaliation for a perceived wrong.

Nor are we persuaded by defendant's argument that an abuse of discretion is shown by the trial court's *initial* ruling that it would allow Maureen to testify only more generally that defendant had assaulted her on multiple prior occasions and she had twice received medical treatment as a result.  Whatever the merits of the court's initial ruling, it ultimately limited the evidence the jury heard of defendant's violence toward Maureen to two

18

incidents, both of which are probative of defendant's intent in assaulting Hoglund.

Defendant also argues evidence of the prior assaults was improperly admitted to bolster Maureen and Jennifer's credibility—that is, to allay any concerns the jury might have had about accepting the testimony of witnesses who participated in the aftermath of the crime by showing they did so out of fear of what defendant might do to them if they refused. He argues the evidence was not relevant for this purpose because he never challenged the credibility of these witnesses and that, even if it was relevant, the jury did not need to hear the full details of his brutal attacks to understand the witnesses acted out of fear.

Defendant's assertion that he did not seek to impugn the credibility of Maureen and Jennifer is called into question by the fact that he *did* introduce impeachment evidence of their prior criminal convictions and of the fact the District Attorney's office had paid for Jennifer to stay in a hotel since she lacked stable housing around the time of her testimony. In any case, we need not consider whether the evidence would have been admissible on the separate ground of bolstering these witnesses' credibility. We have already concluded the evidence was admissible to show defendant's motive in attacking Hoglund. And defendant has shown no error or prejudice in informing the jury it could *also* consider it in evaluating the credibility of Jennifer and Maureen.

## II. Motion for Mistrial or to Reopen Jury Voir Dire

*A. Additional Relevant Procedural Background*

As we have explained, during motions in limine, on October 25, 2018, the trial court indicated that, to show the jury the reasons Jennifer and Maureen assisted defendant, it would allow Jennifer to testify that she had

seen defendant hit someone with a two-by-four and that he had suffered a conviction as a result, and it would allow Maureen to testify that defendant had beaten her in the past and that she had received medical attention as a result.  The court emphasized, however, that its in limine rulings were not final.

Defendant moved for reconsideration of the ruling on November 16, 2018, and the court considered the motion on November 19.  During the hearing, the court indicated it considered the evidence admissible not only to explain why Maureen and Jennifer assisted defendant, but also under section 1101 to prove defendant's intent, premeditation, and deliberation.  When defense counsel objected that the court had "expanded the . . . theory of admissibility," the court replied that defendant's motion had indeed caused it to reconsider its earlier ruling, and it now seemed to the court there were additional grounds of admissibility.  Defense counsel told the court he and the prosecutor disagreed on what evidence was admissible under the court's earlier ruling.  The court indicated its earlier ruling was not intended to limit the prosecutor to asking only the generic questions of whether the witnesses had been attacked and whether Maureen had received medical attention.

The prosecutor compiled the extensive list of defendant's prior violent acts that it wished to introduce.  In further discussions on November 20, 2018, the court noted that it had previously explained it did not consider its in limine rulings to be final, but it added that it would allow evidence of only a limited number of prior incidents to be introduced.  Defense counsel objected that he had not asked the jury during voir dire any questions regarding some of the more extreme details that might now come into evidence, such as the facts that Maureen was pregnant at the time of one

20

beating and that defendant burned her with a spoon, split her head open with a torch, and forced her to undress.

Defendant moved for a mistrial or, alternatively, to reopen jury selection and allow additional voir dire and the exercise of unused peremptory challenges on November 26, 2018, by which time the jurors had been selected, but not yet sworn, and the remaining jury pool had been dismissed. He argued that he had relied on the court's original October 25 decision on the motion in limine when making decisions about the juror questionnaire, voir dire, selection of jurors, conducting investigations, and subpoenaing witnesses and documents.

Before ruling on the motion, the court announced its ruling on the admissibility of evidence of other crimes: it would allow evidence of the two incidents with Maureen and the incident with Michele, but would not allow evidence that defendant burned Maureen with a spoon or subjected her to sexual abuse or prostitution.

Defense counsel argued that the evidence of Maureen being forced to strip naked amounted to evidence of sexual assault and that he had not addressed sexual assault in his voir dire of prospective jurors, but the court rejected the assertion. Defense counsel told the court that he would have exercised peremptory challenges on some of the jurors had he known the court would change its earlier ruling. The court concluded defendant's right to conduct voir dire had not been prejudiced. The court denied the motion for a mistrial or to reopen voir dire.

*B. Analysis*

Defendant contends the trial court erroneously denied his motion for a mistrial or to reopen voir dire. He contends the court's ultimate rulings dramatically expanded the admissible evidence to include sexual violence in

21

the form of kicking a pregnant woman in the stomach and forcing Maureen to strip naked before beating her, and the voir dire of potential jurors was insufficient to ensure their impartiality in light of this evidence. And as a result, he contends, his counsel was unprepared for trial and he was deprived of a fair trial.

A defendant is entitled to be tried by 12 impartial and unprejudiced jurors who are willing to decide the case solely on the evidence before them. (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.) Voir dire plays a critical role in protecting this right. (*People v. Earp* (1999) 20 Cal.4th 826, 852.) Voir dire can expose possible bias, both known or unknown, resulting in a juror being excused for cause or guiding the parties in exercising their peremptory challenges. (*In re Hitchings* (1993) 6 Cal.4th 97, 110–111.) Defendant contends he would have exercised his peremptory challenges differently had he anticipated the court would allow graphic testimony about the three assaults to which Maureen and Jennifer testified rather than allowing only more generic testimony about the assaults that caused them to fear defendant.

Defendant also argues the "last-minute" ruling prevented his counsel from preparing adequately for trial, including conducting an adequate investigation into the other crimes evidence, in violation of his right to effective assistance of counsel. (See *People v. Alexander* (2010) 49 Cal.4th 846, 934 [defendant must have " ' "reasonable opportunity to prepare a defense and respond to the charges" ' "].) As a result, he argues, his chance of receiving a fair trial was irreparably damaged. (See *People v. Collins* (2010) 49 Cal.4th 175, 198–199 (*Collins*).)

We review a trial court's rulings on a motion for a new trial and a motion to reopen jury selection for abuse of discretion. (*People v. Clark* (2011)

52 Cal.4th 856, 990 [mistrial]; *People v. Niles* (1991) 233 Cal.App.3d 315, 320–321.)

To support his contention that the change from the trial court's original ruling on his motion in limine entitled him to a mistrial or additional voir dire, defendant draws our attention to general law describing the role of motions in limine. The purpose of such motions is to preclude the presentation of inadmissible and prejudicial evidence. (*People v. Morris* (1991) 53 Cal.3d 152,188, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) They may be brought by the parties, argued, and ruled upon either at the beginning of, or during trial. (*Morris*, at p. 188.) Defendant argues that he was entitled to rely upon the court's original October 25, 2018 ruling in formulating his trial strategy and questioning jurors.

Defendant's argument ignores two crucial facts. First, the trial court made clear from the outset that it did not consider its rulings on the motions in limine to be final. Second, and perhaps more important, defendant himself asked the court to reconsider its original ruling. Defendant draws our attention to no authority that when a party asks a court to reconsider a ruling on a motion in limine, the outside limits of the evidence the court may admit are defined by the terms of its original ruling.

We certainly do not fault defense counsel for bringing the motion for reconsideration. Defendant's primary goal was to preclude the jury from hearing the evidence of his prior violent behavior toward Maureen and Michele, or at the least to limit the evidence it would hear, by pointing out he did not intend to attack their credibility. But defendant does not persuade us that, after making its ruling in the face of defendant's own request for

23

reconsideration, the trial court abused its discretion in declining to declare a mistrial or reopen jury selection.

Although the record before us does not include a transcript of the jury voir dire, the trial court told defense counsel, and defendant does not dispute, that the jury was informed there would be evidence of prior acts of severe violence, and defense counsel was able to question jurors about the effect that evidence might have on their views of the case. Defendant argues he did not know he should question the jurors about their views on *sexual* assaults, as he characterizes the attacks on Maureen, once because she was forced to strip and once because she was pregnant. The trial court considered this point and rejected it, concluding the beatings did not involve a sexual assault on Maureen's body and that defendant had an adequate opportunity to inquire into the jurors' biases. We see no abuse of discretion in this ruling.

## III. Evidence Defendant told Maureen to Kiss Hoglund's Body

In response to one of defendant's motions in limine, the trial court directed the prosecution to admonish witnesses not to volunteer information that the court had excluded. The court said, "So sometimes witnesses blurt out things that you didn't even know that they knew. It's hard to prevent that from happening sometimes. But if you have a witness whose testimony you know is affected by an in limine ruling then that person should be advised." Later, during a discussion of the admissibility of defendant's prior assaults on Maureen, the prosecutor said he planned to ask Maureen leading questions so she would not disclose inadmissible evidence regarding rapes and prostitution, and the court told him to tell the witnesses the court expected them not to volunteer information that had been excluded.

During redirect examination, the prosecutor followed up on questions defense counsel asked during cross-examination about what happened when

24

she was cleaning up Villedrouin's house. The prosecutor asked whether Maureen had gotten close enough to examine Hoglund's hands or hair, and Maureen replied, "Well, like I said, there was a point where he told me to take the cover off her face and bend down and give her a kiss and I didn't actually do that but I got pretty close to her face. So, I mean, I saw her face. Not her hands though." The prosecutor elicited further information about this incident, including that Maureen thought defendant told her to kiss Hoglund's face to suggest that she would end up like Hoglund. Defense counsel objected to that question on the ground of speculation but made no other objection to the testimony.

After Maureen finished her testimony, defendant moved for a mistrial, arguing the evidence that defendant told Maureen to kiss Hoglund's dead body was unanticipated, outside the scope of cross-examination, and unfairly prejudicial. Defense counsel said he saw some of the jurors crying as they left the courtroom after the testimony. The trial court denied the motion. It noted that Maureen had volunteered unanticipated information that was "somewhat unique and unusual," but said that it was "one of literally dozens of pretty . . . gri[s]ly circumstances that are part and parcel of this case." And, the court concluded, defendant's actions and statements after the killing—"cynical" statements of "self satisfaction" that suggested he was not upset at what he had done—were relevant to his mental state when he killed Hoglund.

Defendant contends the trial court abused its discretion in denying his mistrial motion. He argues that his chances of a fair trial were irreparably damaged by the " 'incurable' " prejudice from Maureen's unanticipated testimony. (See *Collins, supra*, 49 Cal.4th at pp. 198–199.) And, he contends, the evidence had no probative value because he was implicitly

threatening only *Maureen* when he told her to bend down and kiss Hoglund's body. We disagree. The trial court could reasonably conclude the evidence was relevant to defendant's state of mind, the primary disputed issue in the case; indeed, defendant himself concedes he is "not arguing over the admissibility of the evidence."

We agree with defendant that the evidence that he tried to make Maureen kiss Hoglund's dead body is deeply disturbing. But by the same token, it suggests defendant was not overcome with horror or remorse in the aftermath of killing Hoglund, and it could reasonably assist the jury in determining his mental state at the time of the killing. In essence, defendant's argument is that his own actions, in the context of the crime with which he was charged, were so horrifying that he could not receive a fair trial if the jury heard of them. That proposition is self-refuting. The court did not abuse its discretion in denying the mistrial motion on this basis.

Defendant also argues the prosecutor committed misconduct when he failed to ensure Maureen would not provide inadmissible testimony and when he continued to question her about the matter after she volunteered the unexpected information about the kiss. Again, we disagree. " ' "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated." ' [Citations.] ' "Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury." ' " (*People v. Shazier* (2014) 60 Cal.4th 109, 127.)

Defendant points out correctly that it is misconduct for a prosecutor intentionally to elicit inadmissible evidence. (*People v. Smithey* (1999) 20

26

Cal.4th 936, 960.) But he has not shown the prosecutor did so here. The court earlier ruled that based upon what it had then heard, anything that occurred during the course of the killing or the events related to burial of the body, including physical assaults on Maureen, was relevant and admissible. Maureen's testimony that defendant told her to kiss Hoglund's body fell within the scope of this ruling, and after hearing the evidence the court itself concluded it was admissible. We see no misconduct in the prosecutor eliciting further testimony about these events.

## IV. Pinpoint Instruction on Intent

The trial court provided standard instructions on murder and manslaughter. The instruction on murder, CALCRIM No. 520, told the jury that to prove defendant guilty of murder, the People must prove he committed an act that caused the death of another person and that he had a state of mind called malice aforethought. The jury was instructed on express and implied malice. Specifically, it was told, defendant acted with express malice if he "unlawfully intended to kill," and with implied malice if he intentionally committed an act, the natural and probable consequences of which were dangerous to human life, he knew at the time that the act was dangerous to human life, and he deliberately acted with conscious disregard for human life. (CALCRIM No. 520.) CALCRIM No. 521 told the jury defendant was guilty of first degree murder if he acted willfully, deliberately, and with premeditation, and that the requirement of willfulness was met "if he intended to kill." As to manslaughter, the jury was instructed under CALCRIM No. 570 that "[a] killing that would otherwise be [m]urder is reduced to [v]oluntary [m]anslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion."

Citing *People v. Lasko* (2000) 23 Cal.4th 101, 109, defendant asked the court to include a pinpoint instruction that "the presence or absence of an intent to kill is not dispositive of whether the crime committed is murder or the lesser offense of voluntary manslaughter." The trial court declined to give the instruction. Defendant argues this ruling was error.

"A criminal defendant is entitled, on request, to instructions that pinpoint the theory of the defense case." (*Gutierrez, supra*, 28 Cal.4th at p. 1142.) But a pinpoint instruction may be refused if the standard instructions fully and adequately advise the jury on the issue. (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.)

We conclude the pattern instructions already fully and adequately advised the jury of the point defendant sought to make through the pinpoint instruction. After being instructed that defendant acted with malice if he unlawfully intended to kill, the jury was told that "[a] killing *that would otherwise be [m]urder* is reduced to [v]oluntary [m]anslaughter" if defendant killed due to sudden quarrel or heat of passion. (Italics added.) Logically, "[t]he killing could not 'otherwise be murder' unless the jury found defendant intended to kill the victim or acted with conscious disregard for human life." (*People v. Genovese* (2008) 168 Cal.App.4th 817, 831–832; see *People v. Moon* (2005) 37 Cal.4th 1, 32 [no error in refusing pinpoint instruction when concepts incorporated in general way in pattern instruction].) The instructions informed the jury of the applicable legal principles, and the trial court did not err in refusing the pinpoint instruction.

Finally, because we find no error or abuse of discretion in the rulings and the instruction defendant challenges, we necessarily reject his claim that he was prejudiced by the cumulative effect of the trial court's errors.

## V.   Victim Restitution

The probation officer's report indicated that the Victim's Compensation Board (the Board) would assist the victim's family as needed and stated the District Attorney's office would submit any specific costs at the time of sentencing.

At the sentencing hearing, the prosecutor told the court he had provided the court clerk with information on restitution owed for funeral expenses, indicating the restitution would be paid to the Board.  The court asked who had paid the funeral expenses, and the prosecutor said that he did not know but that $7,500 was the limit of what the People would request. The court asked if defendant disputed the amount, and defense counsel said, "No, I am not requesting a hearing on behalf of my client.  I did have the same question the Court had regarding who actually incurred this cost and if it was a cost that was actually incurred.  But, presumably, the Victim's Compensation Board didn't create it out of thin air.  [¶] . . . [¶]  Mr. Reese is not objecting to that component."  The trial court ordered defendant to pay $7,500 in victim restitution jointly and severally with Villedrouin, his co-defendant.

Defendant now challenges the $7,500 in victim restitution on the ground there is no evidence the Board actually reimbursed anyone for funeral expenses.  And, he points out, there is no indication the Board provided certified copies of bills showing the amount of assistance it provided, as required by statute.  (Pen. Code, § 1202.4, subd. (f)(4)(B).)

Defendant has forfeited this contention by his failure to raise it in the trial court.  "A defendant wishing to argue on appeal that there is no factual basis for a restitution order must object on that ground in the trial court to preserve the issue for appeal."  (*People v. Mays* (2017) 15 Cal.App.5th 1232,

1237 (*Mays*); accord, *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 ["[B]y his failure to object, defendant forfeited any claim that the [victim restitution] order was merely unwarranted by the evidence, as distinct from being unauthorized by statute"].)  Having acquiesced to the victim restitution below, defendant may not challenge it now.

In the alternative, defendant contends his counsel rendered ineffective assistance by failing to object to the award.  We do not reverse for ineffective assistance of counsel unless the defendant establishes both "that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068.)  Defendant makes no showing that the Board did not assist with funeral expenses or that the amount awarded was excessive.  In the absence of a showing of prejudice, his claim on direct appeal of ineffective assistance of counsel must fail.  (See *Mays*, *supra*, 15 Cal.App.5th at p. 1238.)

## VI.   Fines and Fees

In addition to victim restitution, the trial court imposed the minimum $300 restitution fine for each of the two offenses (Pen. Code, § 1202.4, subd. (b)); the same amount in suspended parole revocation fines (Pen. Code, § 1202.45); $40 per offense as a court operations assessment (Pen. Code, § 1465.8), and $30 per offense as a criminal conviction assessment (Gov. Code, § 70373).  It did not order a probation report fee or attorney fees. Defendant objected to these fines and fees on the ground he was indigent and unable to pay, and the court indicated his prison wages could be used to pay them.

Defendant contends that under *People v. Dueñas* (2019) 30 Cal.App.5th 1157, the trial court deprived him of due process in imposing the $300

30

restitution fine. *Dueñas* held that, because the only reason the defendant could not pay the fines and fees the trial court imposed as a condition of probation was her poverty, it was unconstitutional to use the criminal process to collect a fine she could not pay. (*Id.* at p. 1160.) The defendant there, who had cerebral palsy, was unemployed, she had an unemployed husband and two young children, and she had suffered a cascade of debt and jail time arising out of unpaid fines for juvenile citations, a resulting suspended driver's license, and convictions for driving with a suspended license. (*Id.* at p. 1161.) The conviction at issue in the case resulted in further fines and assessments, despite her demonstrated inability to pay them. (*Id.* at pp. 1162–1163.) The appellate court concluded that due process of law required the trial court to hold a hearing on the defendant's ability to pay before imposing court facilities and court operations assessments under section 1465.8 and Government Code section 70373, and that execution of a restitution fine under section 1202.4 must be stayed until the trial court held a hearing and concluded the defendant had the ability to pay the fine. (*Id.* at p. 1164.)

Since *Dueñas* was decided, a number of cases have concluded the excessive fines clause of the Eighth Amendment, rather than due process principles, provides the proper analytic framework in this situation. In *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952, Division Four of this court held that "upon proper objection, a sentencing court must allow a defendant facing imposition of a minimum restitution fine or court operations and court facilities assessments an opportunity to present evidence and argument why these financial exactions exceed his ability to pay" (*id.* at p. 34), and that those exactions may be analyzed as fines under the excessive fines prohibition of the Eighth

Amendment (*id.* at pp. 42–45; see also *People v. Kopp* (2019) 38 Cal.App.5th 47, 96–97, review granted Nov. 13, 2019, S257844 [as to restitution fine under section 1202.4]).

Still other cases have concluded *Dueñas* was wrongly decided without reaching the question of whether to consider ability to pay under the rubric of the excessive fines and fees clause. (See, e.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 324–329, review granted, Nov. 26, 2019, S258946; *People v. Petri* (2020) 45 Cal.App.5th 82, 89–92.)

Under none of these separate lines of authority has defendant shown constitutional error. The trial court gave defendant the opportunity to challenge imposition of the recommended restitution fine, his counsel responded by arguing his indigence should excuse him from paying fines or fees, and the trial court imposed the minimum restitution fine and parole revocation fine and declined to impose other fines, including one that had been recommended by the Probation Department. It thus appears the court considered defendant's ability to pay the fines. Appropriately, the trial court considered defendant's ability to earn money in prison. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076.) Defendant was 40 years old when convicted. There is no indication he suffered the "extreme financial hardship" experienced by the defendant in *Dueñas* (see *People v. Roberts* (2021) 65 Cal.App.5th 469, 483) or that he would be unable to work in prison. As in *Roberts*, the trial court did not err by imposing minimum fines and fees without conducting a hearing into defendant's ability to pay. (*Id.* at p. 483.),

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Reese* (A157480)